USCA1 Opinion

 

 
 United States Court of Appeals
 
 For the First Circuit
 
 ____________________

No. 99-1222

 CABLEVISION OF BOSTON, INC.,
 
 Plaintiff, Appellant,
 
 v.
 
 PUBLIC IMPROVEMENT COMMISSION OF THE CITY OF BOSTON;
 JOSEPH F. CASAZZA, MICHAEL GALVIN, GARY MOCIA, PARA M.
 JAYASINGHE, and STEPHEN SHEA, as Commissioners of the Public
 Improvement Commission of the City of Boston; 
 CITY OF BOSTON; BOSTON EDISON COMPANY; BECOCOM, INC.; RCN-
 BECOCOM, LLC; RCN TELECOM SERVICES OF MASSACHUSETTS, INC.; and
 RCN CORPORATION,
 
 Defendants, Appellees.
 ____________________
 
 On Appeal from an Order Denying a Motion 
 for Preliminary Injunction 
 Entered by the United States District Court 
 for the District of Massachusetts
 [Hon. Mark L. Wolf, U.S. District Judge]

 ____________________

 Before
 
 Lynch, Circuit Judge,
 Noonan, Senior Circuit Judge,
 and Lipez, Circuit Judge.
 
 ___________________
 

 J. Anthony Downs, with whom Stephen D. Poss, Jeffrey A.
Simes, and Goodwin, Proctor & Hoar LLP were on brief, for
appellant Cablevision of Boston, Inc.
 Merita A. Hopkins, Corporation Counsel, with whom Laura
Steinberg and Sullivan & Worcester LLP were on brief, for
appellees Public Improvement Commission of the City of Boston;
Joseph F. Casazza, Michael Galvin, Gary Mocia, Para M.
Jayasinghe, and Stephen Shea, as Commissioners of the Public
Improvement Commission of the City of Boston; and the City of
Boston. 
 Roscoe Trimmier, Jr., with whom R.K. Gad III, Philip C.
Koski, Russell P. Hanser, Deborah L. Levi, and Ropes & Gray were
on brief, for appellees Boston Edison Company and BecoCom, Inc.
 Michael J. McHugh, with whom James T. Finnigan, K. Jill
Rizzotti, and Rich, May, Bilodeau & Flaherty, P.C. were on brief,
for appellees RCN-BecoCom, LLC; RCN Telecom Services of
Massachusetts, Inc.; and RCN Corporation.

 ____________________
 
 August 25, 1999

 ____________________ LYNCH, Circuit Judge. Cablevision of Boston sought a
preliminary injunction in federal court against its principal local
competitors in the developing broadband telecommunications market.
Its complaint alleged that these competitors had taken unfair
advantage of their access to underground electrical conduit in
violation of Mass. Gen. Laws ch. 93A. Cablevision also sought
injunctive relief against the City of Boston, arguing that the City
had failed to manage the conduit rights of way in a competitively
neutral and nondiscriminatory manner in violation of 253(c) of
the Federal Telecommunications Act of 1996, 47 U.S.C. 253(c). 
After an evidentiary hearing, the district court denied the motion
for a preliminary injunction. Cablevision appeals.
 Cablevision's suit names as defendants Boston Edison
Company, a public utility, and its unregulated affiliate BecoCom,
Inc. (collectively "Boston Edison"), as well as RCN Corporation and
its subsidiary RCN Telecom Services of Massachusetts (collectively
"RCN"). It also names RCN-BecoCom ("the Joint Venture"), a joint
venture between RCN and BecoCom which, like Cablevision, plans to
offer broadband telecommunication services in Boston. For
convenience, we refer to these entities collectively as the private
defendants. In addition, Cablevision sued the Public Improvement
Commission of the City of Boston ("PIC"), the PIC Commissioners, in
their official capacities, and the City of Boston. We refer to
these defendants collectively as "the City." 
 Cablevision complains that Boston Edison pulled
telecommunications cable through its existing electrical conduit
for the benefit of the Joint Venture without giving proper public
notice of this altered use and without seeking prior approval from
the City. It alleges that the City wrongfully enabled the Joint
Venture to take unfair advantage of Boston Edison's existing
conduit and cable, by allowing Boston Edison to convert conduit and
cable for the Joint Venture's benefit over a two-year period
without imposing on Boston Edison the obligations imposed on
entities constructing new conduit. In contrast, Cablevision says,
it has been required to go through a time-consuming public
application process for new grants of location when it wished to
construct new conduit for broadband telecommunications cable, and
it has had to provide the City with shadow conduit in that
construction. 
 Approximately two years after passage of the
Telecommunications Act, the City began imposing on conduit owners
an unwritten policy that requires the owners to seek amended grants
of location if they wish to expand or alter their use of existing
conduit. PIC has since awarded such amended grants of location to
Boston Edison, including after-the-fact amendments for conduit
conversions that occurred between 1996 and 1998. Cablevision's
preliminary injunction would prevent the City from granting the
private defendants any further amended grants of location and would
forbid the private defendants from installing any new
telecommunications cable in electrical conduit or expanding their
commercial usage of any previously installed telecommunications
cable. 
 We set aside, for the narrow purposes of this appeal, the
difficult question whether Cablevision has a cause of action to
enforce rights under 253(c), as well as related questions
regarding the proper interpretation of that section of the
Telecommunications Act. Assuming arguendo that Cablevision has a
 253(c) cause of action and that 253(c) requires the City to
manage its rights of way on a competitively neutral and
nondiscriminatory basis, we determine that Cablevision is unlikely,
in any event, to show that the City failed to fulfill this
requirement. We further conclude that Cablevision is unlikely to
prevail on its Chapter 93A claim in this action. Thus, we affirm
the district court's denial of preliminary injunctive relief. 
 I. FACTS
 The facts are largely taken from the opinion of the
district court. For the most part, these are undisputed; the few
points of disagreement are noted. Because key aspects of this case
involve changes that have occurred over time and actions that are
alleged to have been untimely, we present the facts
chronologically. 
 In Boston, as elsewhere, the electricity and cable
television businesses were once entirely distinct enterprises. 
Boston Edison has provided electricity to customers in the Greater
Boston area since 1886, using a large network of underground
conduits as well as above-ground transmission lines and towers. As
a public utility, Boston Edison has enjoyed a statutory monopoly. 
Cablevision is equally well-established in Boston as a provider of
cable television. It began building a system to deliver cable
television signals within Greater Boston in the 1970s and largely
completed that system, and began providing cable service, by 1982.
Unlike Boston Edison, Cablevision does not possess a statutory
monopoly. However, it did enjoy a de facto monopoly for many
years. Although its two franchise agreements with the City have
been non-exclusive, it had no local competitors until 1996, when a
predecessor affiliate of RCN entered the Boston cable television
market. Cablevision still services approximately ninety-seven
percent of Boston cable customers. 
 In order to reach their customers, both Boston Edison and
Cablevision have needed to install conduit under the streets of
Boston. State law permits them to do so, see Mass. Gen. Laws ch.
166, 21, but requires them to first obtain a grant of location
from the appropriate municipal authority, see id. 22. 
Cablevision obtains grants of location for its conduit from the
PIC, which is the division of the City's Department of Public Works
responsible for construction projects involving City streets. 
Applicants submit a detailed public petition to the PIC, which
decides after a public hearing whether to bestow the requested
grant of location. Boston Edison receives similar grants of
location for its electrical conduit from another municipal
authority, the Inspectional Services Division (ISD). It is not
clear from the record whether the ISD process is as open to public
involvement as the PIC procedure. It appears, in any case, that
the PIC is the entity ultimately responsible for maintaining a
record of the various grants of location -- a record that amounts
to a map of Boston's subterranean conduit network.
 Since 1988, the PIC has enforced a written "Policy
Relating to Grants of Location for New Conduit Network for the
Provision of Commercial Telecommunications Services" ("the PIC
Policy"), which was designed to minimize the number of times City
streets would have to be torn up for underground construction,
while simultaneously maximizing the amount of conduit space
available for the provision of telecommunication services. As its
full name makes clear, the PIC Policy applies only to the
installation of new conduit for commercial telecommunications
purposes. The PIC Policy requires any entity or "Lead Company"
that wishes to install new telecommunications conduit to build
additional empty shadow conduit for the City that can be used to
meet future demand. Once the City's shadow conduit is installed,
the PIC Policy requires a provider to lease any available space in
that conduit before constructing new conduit. The PIC Policy, as
amended, also requires those constructing new conduit to notify all
interested telecommunications providers of their intent to cut the
street and to offer these providers the opportunity to have their
own conduit installed at the same time. Under the policy,
participants in approved projects share the costs of excavation,
conduit construction (including construction of shadow conduit),
and street resurfacing.
 The parties debate the extent to which Cablevision has
been economically burdened by the PIC Policy. Boston Edison notes
that most of Cablevision's conduit was constructed prior to the
adoption of the PIC Policy in 1988, while Cablevision emphasizes
the delays and expenses that it has borne for any conduit installed
since that time. By contrast, Boston Edison has been able to avoid
these burdens to the extent that it installed conduit for electric
utility purposes only. Before October 1998, when the Joint Venture
first petitioned PIC as a Lead Company, neither Boston Edison nor
any of its affiliates had ever applied to the PIC for a grant of
location.
 But long before October 1998, Boston Edison had been
considering expanding into the telecommunications business and
taking steps in that direction. One driving force behind this
transformation was the need to diversify in response to the
deregulation of the electricity business. Another factor was
opportunity. Boston Edison already owned a vast distribution
network, in the form of conduit and poles, which could be used to
carry telecommunications cable. Moreover, it already had a
rudimentary fiber optic network in place that was originally built
to carry signals to control the distribution of electricity, but
which had significant excess capacity. According to Boston Edison,
the excess capacity was not a planned feature; rather, it came
about because manufacturers of fiber optic cables included many
more fiber strands in their standard product than Boston Edison
needed for utility purposes. 
 In late 1995, Boston Edison informed the PIC Chairman,
Joseph Casazza, that it intended to use its existing conduit (and
excess fiber capacity) for commercial telecommunications purposes
and asked Casazza whether the City had any policies regarding this
conversion. After taking a month to consider the issue, Casazza
told Boston Edison that he did not think the City had an applicable
policy. In particular, he did not think that the PIC Policy
applied, since, by its terms, it referred only to the construction
of new conduit. In response to Boston Edison's query, Casazza
decided to convene a small working group, composed of Boston Edison
and certain local telecommunications providers, to draft a proposed
policy on the conversion of existing conduit and cables.
 Meanwhile, Boston Edison began to expand its fiber optic
network in 1996 with the goal of eventually entering the
telecommunications business. Although the expansion was
significant (involving more than 7,000 "fiber-miles" along 103
right-of-way miles), it apparently did not involve the installation
of any new conduit under Boston streets, and so did not expose
Boston Edison to the demands of the extant PIC Policy. 
 Once Boston Edison made the decision to construct a fiber
optic network for telecommunications purposes, it also began to
search for customers (i.e., telecommunications providers) that
might want to make use of the network. According to Boston Edison,
it contacted Cablevision along with a number of other providers,
but Cablevision stated that it had no interest in using Boston
Edison's network. Cablevision vigorously disputes this point; it
claims that a Boston Edison official made only an informal, offhand
comment about access to fiber and never made clear that Boston
Edison was offering access to its underground electrical conduit
within the City of Boston. 
 Boston Edison eventually entered into a joint venture
agreement with RCN, which had begun supplying cable television to
a small number of Boston customers. The Joint Venture,
Cablevision's competitor in the developing broadband market, is the
product of that agreement. RCN issued a press release on June 30,
1996 to announce the formation of the Joint Venture with Boston
Edison. The press release stated that the Joint Venture would
benefit from the use of Boston Edison's "large fiber optic
network." The Boston Globe later repeated this point, reporting
that "RCN hopes to use Boston Edison's 200 mile fiber optic network
and its rights of way into customers['] homes to compete head to
head with the large telecommunications providers." In June 1997,
BecoCom and the Joint Venture entered into an agreement giving the
Joint Venture the right to use the conduit and cable network that
Boston Edison assigned to BecoCom pursuant to a license agreement. 
The Joint Venture has begun using this network to deliver
telecommunications service in Boston.
 While these changes were occurring in Boston, a dramatic
change was made in federal telecommunications law. On February 8,
1996, Congress enacted the Telecommunications Act of 1996 (TCA), 
Pub. L. No. 104-104, 110 Stat. 86 (codified at 47 U.S.C. 151 et
seq.), to remove regulatory barriers and encourage competition
among telecommunications providers. Although a large portion of
the TCA focuses on the deregulation of the telephone industry,
Congress also expressly anticipated and welcomed the entry of
electrical utilities into the telecommunications business.
 Several months after passage of the TCA, the industry
working group presented Casazza with a draft policy regarding the
use of utility conduit and cable for commercial telecommunications. 
The proposed policy would have required utilities to submit plans
to the PIC showing the location of all existing cable and conduit
that were selected for conversion. In addition, the policy would
have required utilities to apply to the PIC for an amended grant of
location before adding telecommunications cable to utility conduit
or converting existing utility cable to telecommunications use. 
 Casazza did not immediately act on the working group's
recommendations. He had several reasons to delay his decision. 
First, he wanted to be sure that any PIC policy regarding
conversion was compatible with requirements imposed by the TCA. 
Casazza states that he wanted to avoid hurriedly adopting a policy
that might "be in conflict with a brand new law that we totally
didn't understand." He also wanted to be sure that the PIC stayed
within the narrow scope of its authority. In Casazza's view, the
PIC's purpose is not to control the usage of conduit and cable, but
rather to manage city streets and keep appropriate records. In
informal terms, Casazza explains, that purpose is fulfilled by
telling businesses "[if] you're under our streets, come in here and
tell us who you are, [and] where you are, so we can make a map." 
Casazza notes that the City needs to have such a map so that, for
example, "the next time [a] contractor digs up a city street we're
not going to wipe out all the research at Tufts Medical Center." 
 In light of this understanding of the PIC's mandate,
Casazza emphasizes that he never gave Boston Edison permission to
convert cables or conduit for telecommunications purposes; nor did
he deny Boston Edison permission to do so. Rather, Casazza simply
advised Boston Edison and the other members of the working group
that he did not intend to immediately adopt the group's proposed
policy, and that they would therefore have to continue with
conversions at their own risk, subject to any future policy adopted
by the PIC, the City, or some other regulatory authority. It is
unclear from the record whether Cablevision was present at this
meeting.
 To date, the City has still not adopted any formal
written policy regarding grants of location for converted conduit
or cable. However, the PIC has begun enforcing an oral policy,
loosely tracking the industry-drafted policy from April 1996, which
requires businesses to acquire amended grants of location if they
change their usage of existing conduit or cable. It is not clear
from the record whether this oral policy requires businesses to
seek an amended grant of location before they install any new cable
or merely before they put the new (or existing) cable to an altered
use. 
 The City informed Boston Edison of this policy by
telephone conversation on April 6, 1998. After seeking further
clarification, Boston Edison presented its first petition for
amended grants of location on June 5, 1998. In the fall of 1998,
Boston Edison filed additional petitions with the PIC for amended
grants of location, a number of which pertained to conversions that
Boston Edison had already completed. Over Cablevision's
objections, the PIC granted each of these petitions. During the
same time period, the PIC also applied its conversion policy to
Bell Atlantic, a telephone utility that had previously installed
additional telecommunications cable in its conduit. Acting on five
to ten Bell Atlantic petitions, the PIC recorded amended grants of
location to reflect Bell Atlantic's expanded use of its conduit for
telecommunications purposes. The PIC granted the petitions from
Boston Edison and Bell Atlantic without considering the impact of
the amended grants of location on competition in the
telecommunications business. 
 II. PROCEDURAL HISTORY
 Cablevision filed a federal lawsuit against the City and
the private defendants on December 14, 1998. The complaint alleges
that the private defendants carried out a "scheme . . . designed to
create a 'stealth' telecommunications network using ratepayer funds
and . . . to obtain through deception an unfair competitive
advantage . . . by violating City ordinances and policies governing
the use of conduits and cables buried under Boston's streets."
According to Cablevision, the private defendants violated Chapter
93A (Massachusetts' unfair trade practices law) when they concealed
their use of electrical conduit for telecommunications purposes
from the City, avoided applying for permission to convert
electrical conduit, and failed otherwise to notify competitors of
the planned conversions, in order to lower their costs and beat
competitors in the race to sign up telecommunications customers. 
 In the alternative, Cablevision suggests that the City
knew about the private defendants' wrongful actions all along and
secretly permitted those actions. Regardless of the City's
knowledge of the private defendants' activities, Cablevision
complains, the City's recent decision to give Boston Edison after-
the-fact or retroactive amended grants of location "enables the
defendants' scheme to succeed" and "solidif[ies] the significant
unfair competitive advantage the non-municipal defendants have
obtained," in violation of the City's obligation under 253(c) to
manage its rights of way in a competitively neutral and
nondiscriminatory manner. 
 Cablevision seeks both damages and injunctive relief. 
Its proposed preliminary injunction would require the City to deny
the private defendants any further grants of location, whether
amended or new, for conduit or cable that is specifically intended
for commercial telecommunications use or that uses or connects to
any conduit or cable for which Boston Edison has already received
amended grants of location. In addition, the injunction would
require the City to determine how each segment of the private
defendants' conduit and cable is being used and to report these
uses to the parties and the court. The injunction would place
similar demands on the private defendants, requiring them to cease
any expansion of their telecommunications infrastructure or
business and to furnish a complete description of all portions of
their network that rely on former electrical conduit or cable. 
 The parties admirably agreed to maintain the status quo
for a period of time to enable the district court to hold a hearing
and reach a decision on Cablevision's preliminary injunction
motion. In addition to considering voluminous filings, including
affidavits, the court held a six-hour evidentiary hearing on
January 20, 1999, before denying the motion. See Cablevision of
Boston, Inc. v. Public Improvement Comm'n, 38 F. Supp. 2d 46, 49
(D. Mass. 1999).
 Applying the familiar preliminary injunction standard,
the district court considered four factors: (1) the likelihood of
plaintiff's success on the merits, (2) the threat of irreparable
harm to the plaintiff in the absence of an injunction, (3) the
balance of equities, and (4) the public interest. See I.P. Lund
Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998)
(explaining standard). While recognizing that the first of these
factors is the most critical, see Ross-Simons of Warwick, Inc. v.
Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996); Gately v.
Massachusetts, 2 F.3d 1221, 1225 (1st Cir. 1993), the district
court denied Cablevision's motion because it found that Cablevision
failed to make the necessary showing on each of the four factors. 
See Cablevision, 38 F. Supp. 2d at 53-63.
 The court first considered whether Cablevision has a
legal basis to assert a claim under 253(c). Cablevision proposed
three possible bases: an implied right of action under 253(c)
itself, an enforcement action under 1983, and a preemption claim
under the Supremacy Clause. The district court was skeptical about
the first two bases, but concluded that Cablevision could probably
seek limited relief directly under the Supremacy Clause. See id.
at 54-58. 
 The court went on, however, to find that Cablevision was
unlikely to succeed on the merits of its 253(c) claim. Its
analysis was multilayered. First, the court questioned whether the
phrase "competitively neutral and nondiscriminatory" applies to
local authorities' management of their rights of way. See id. at
58. The court then distinguished between the two terms, finding it
unlikely that 253(c) requires management of public rights of ways
to be "competitively neutral," but possible that 253(c) requires
such management be "nondiscriminatory." See id. at 58-59. 
Assuming arguendo that a nondiscrimination requirement does apply,
the court concluded that Cablevision is nonetheless unlikely to
prevail on its 253(c) claim because the City has managed its
rights of way in a nondiscriminatory manner by treating similarly
situated entities alike. See id. at 59-60. 
 The court also concluded that Cablevision is unlikely to
prevail on its Chapter 93A claim. It found that the private
defendants did not appear to have acted unscrupulously or to have
violated any state law or regulation; indeed, the court found, the
PIC may have affirmatively permitted the private defendants'
actions, thus providing them with a safe harbor under 3 of
Chapter 93A. See id. at 60-62. Thus, the court concluded that
Cablevision was not likely to prevail on the merits of either its
federal or its state claim. 
 As to the preliminary injunction requirement of
irreparable injury, the court found that loss of market share was
an irreparable injury to Cablevision, but that Cablevision had
brought this injury on itself by coming so late to the Boston
broadband telecommunications market. See id. at 62-63. The court
found further that Boston Edison and the other private defendants
would suffer irreparable injury if an injunction issued, and
finally, that issuing an injunction would be contrary to the public
interest in robust competition among telecommunications providers. 
See id. at 63.
 III. STANDARD OF REVIEW
 The standard of review for the grant or denial of a
preliminary injunction has several components. "The usual rubric
refers to abuse of discretion," Ocean Spray Cranberries, Inc. v.
Pepsico, Inc., 160 F.3d 58, 61 n.1 (1st Cir. 1998), which entails
giving "considerable deference" to the district court's decision,
Ross-Simons, 102 F.3d at 16. The abuse of discretion standard
applies, in particular, to "issues of judgment and the balancing of
conflicting factors." Ocean Spray Cranberries, 160 F.3d at 61 n.1. 
But "rulings on abstract legal issues remain reviewable de novo,
and findings of fact are assessed for clear error." Id.; see also
I.P. Lund, 163 F.3d at 33. 
 IV. FEDERAL TELECOMMUNICATIONS ACT CLAIM
 The central question on appeal is whether the district
court erred when it concluded that Cablevision is unlikely to
succeed on the merits of its 253(c) claim. This question
involves a number of subsidiary questions, most of which we merely
identify and set aside in order to focus on the crux of this
matter: whether, pursuant to 253(c), the PIC has been obligated
since 1996 to regulate Boston Edison's use of cable and conduit in
order to create a level playing field among competitors in the
Boston telecommunications market. We determine that 253(c) did
not place such an obligation on the PIC. Thus, we affirm, albeit
on different grounds, the district court's conclusion that
Cablevision is unlikely to prevail on its 253(c) claim.
 A. Section 253(c) in Context
 Cablevision's 253(c) argument can only be evaluated by
placing that subsection in the larger context of the TCA. Although
the TCA is technically written as a set of amendments to the
Communications Act of 1934, 47 U.S.C. 151 et seq., it actually
represents a dramatic shift in the nature of telecommunications
regulation. Regulation of the telephone industry (once the
principal form of telecommunications) was long premised on the
belief that only monopolies could provide reliable, universal
service. Thus, state and federal regulators spent decades
protecting monopolies from competition. The TCA takes the opposite
approach: rather than shielding incumbent telephone companies from
competition, it requires them to provide other participants in the
telecommunications market with competitive access to their networks
and services. This shift exemplifies a widespread change in the
laws governing regulated industries. See Kearney & Merrill, The
Great Transformation of Regulated Industries Law, 98 Colum. L. Rev.
1323, 1325-26 (1998) ("Instead of striving for equality of
treatment among end-users and reliability of service, the new
paradigm seeks to encourage multiple providers to offer different
packages of services at different prices to end-users, on the
theory that competition among these providers will enhance consumer
welfare.") 
 Three central provisions of the TCA -- 251, 252, and
 253 -- instantiate this policy. Section 251 defines the duties
of different classes of telecommunications providers. See 47
U.S.C. 251. All telecommunications carriers have a duty "to
interconnect directly or indirectly with the facilities and
equipment of other telecommunications carriers." Id. 251(a). 
"[L]ocal exchange carriers" (i.e., those who provide telephone
service, see id. 153(26)) also have a duty to allow resale of
their services, to provide number portability and dialing parity,
to establish reciprocal compensation agreements, and "to afford
access to th[eir] poles, ducts, conduits, and rights-of-way . . .
to competing providers." Id. 251(b). An "incumbent local
exchange carrier" (i.e., a telephone service provider in existence
when the Act was passed, see id. 251(h)) is further obligated to
provide interconnection with its network and "unbundled" access to
individual network elements on "just, reasonable, and
nondiscriminatory" terms and to offer its services for resale at
wholesale rates. Id. 251(c).
 Section 252 provides the means of enforcement for the
requirements that 251 places on incumbent local exchange
carriers. See 47 U.S.C. 252. It sets out procedures for
negotiation, arbitration, and approval of interconnection or
service agreements between incumbent local exchange carriers and
other carriers. See id.; see also Puerto Rico Tel. Co. v.
Telecommunications Regulatory Bd., Slip Op. at 13-32 (1st Cir. Aug.
__, 1999) (discussing 252).
 Section 253 is aimed at those who might impede the open
competition engendered by 251 and 252. Section 253(a) ensures
that state and local regulations do not serve as barriers to entry
into the telecommunications market:
 No State or local statute or regulation, or other State
 or local legal requirement, may prohibit or have the
 effect of prohibiting the ability of any entity to
 provide any interstate or intrastate telecommunications
 service.
47 U.S.C. 253(a). Congress apparently feared that some states
and municipalities might prefer to maintain the monopoly status of
certain providers, on the belief that a single regulated provider
would provide better or more universal service. Section 253(a)
takes that choice away from them, thus preventing state and local
governments from standing in the way of Congress's new free market
vision. Cf. Town of Amherst v. Omnipoint Communications Enters.,
Inc., 173 F.3d 9, 12-16 (1st Cir. 1999) (discussing 47 U.S.C.
 332(c)(7)(B)(i), a similar provision in the TCA which provides
that "the regulation of . . . personal wireless service facilities
. . . shall not prohibit or have the effect of prohibiting the
provision of personal wireless service").
 However, Congress also recognized the continuing need for 
state and local governments to regulate telecommunications
providers on grounds such as consumer protection and public safety,
which are separate from any intent to create or maintain barriers
to entry. Thus, it carved out safe harbors for these types of
regulations: 
 (b) State regulatory authority
 Nothing in this section shall affect the ability of a
 State to impose, on a competitively neutral basis and
 consistent with section 254 of this section, requirements
 necessary to preserve and advance universal service,
 protect the public safety and welfare, ensure the
 continued quality of telecommunications services, and
 safeguard the rights of consumers.
 (c) State and local government authority
 Nothing in this section affects the authority of a State
 or local government to manage the public rights-of-way or
 to require fair and reasonable compensation from
 telecommunications providers, on a competitively neutral
 and nondiscriminatory basis, for use of public
 rights-of-way on a nondiscriminatory basis, if the
 compensation required is publicly disclosed by such
 government.
47 U.S.C. 253(b),(c). 
 These subsections take the form of savings clauses,
preserving certain state or local laws that might otherwise be
preempted under 253(a). At the same time, the division between
(b) and (c) seems to define the boundaries of each body's
regulatory authority: it suggests that states may regulate broadly
with respect to public safety and welfare, service quality, and
consumer protection, while local governments, in addition to any
powers specifically delegated by the state, have narrower residual
authority to manage and demand compensation for the use of their
rights of way. See AT&T Communications of the Southwest, Inc. v.
City of Dallas, 8 F. Supp. 2d 582, 591 (N.D. Tex. 1998) (noting
that while "the more general authority" of 253(b) is reserved for
the states, they have the power to delegate such authority to local
governments); In re TCI Cablevision, 12 F.C.C.R. 21,396, 102-104,
109 (Sept. 19, 1997) (stating that (b) and (c) define the subject
area of permissible regulation at the state and local level).
 Other aspects of 253(b) and (c) are less clear. One
open question is whether state or local regulations that are not
competitively neutral or nondiscriminatory necessarily constitute
violations of 253(a). If so, then 253(b) and (c) are only
savings clauses, which happen to restate, in different terms, the
general rule of 253(a). If, on the other hand, a regulation
could fail to be competitively neutral or nondiscriminatory without
constituting a de facto prohibition on entry, then (b) and (c)
could be read to impose requirements of "competitive neutrality"
and "nondiscrimination" that are separate from 253(a)'s
restriction against "prohibitions on entry."
 If the latter interpretation were correct, then an
additional question would arise: how could the putative
"competitive neutrality" and "nondiscrimination" requirements be
enforced? The next subsection of 253 could be read to provide a
partial answer to this question:
 (d) Preemption
 If, after notice and an opportunity for public comment,
 the Commission determines that a State or local
 government has permitted or imposed any statute,
 regulation, or legal requirement that violates subsection
 (a) or (b) of this section, the Commission shall preempt
 the enforcement of such statute, regulation, or legal
 requirement to the extent necessary to correct such
 violation or inconsistency.
Id. 253(d). The creation of an enforcement mechanism for
 253(b) suggests that this provision, while styled as a savings
clause, also imposes a requirement on state regulation that is
separate from that imposed by 253(a). On this reading, the FCC
would be able to enforce the requirement under 253(d).
 But 253(d) raises more questions than it answers. It
is not clear, for instance, whether Congress intended FCC
preemption to be the sole means of enforcing 253(a) and (b), or,
if a private cause of action does exist to enforce either of these
subsections, whether the FCC is intended to have primary
jurisdiction. Compare, e.g., GST Tucson Lightwave, Inc. v. City of
Tucson, 950 F. Supp. 968, 970 (D. Ariz. 1996) (assuming that
 253(d) was meant to be an exclusive remedy for violations of
 253), with City of Abilene v. FCC, 164 F.3d 49, 51-52 (D.C. Cir.
1999) (deciding a 253(a) preemption claim on the merits), Bell
Atlantic-Maryland, Inc. v. Prince George's County, 1999 WL 343646,
at *6 (D. Md. 1999) (assuming that a cause of action exists to
bring a 253(a) claim), and AT&T Communications, 8 F. Supp. 2d at
589 (rejecting the argument that the FCC has primary jurisdiction
over 253(a) claims).
 In addition to these uncertainties, Section 253(d) raises
questions about the proper analysis of 253(c). If 253(b)
imposes a restriction separate from the one in 253(a), it would
seem most natural for 253(c) to impose such a restriction as
well, since the language of (c) is nearly identical to the language
of (b). Yet Congress chose to include (b), and not (c), under the
FCC preemption provision of 253(d). There are at least two ways
to understand this choice.
 One explanation is that Congress intended 253(c) (if
not 253(b)) to be a savings clause only. Under this
interpretation, 253(c) could only be used defensively, in the
context of a 253(a) challenge; the statute would simply not apply
to local regulations that are not competitively neutral and
nondiscriminatory but nonetheless do not constitute prohibitions on
entry. See GST Tucson Lightwave, 950 F. Supp. at 971 (adopting
this interpretation of 253).
 Alternatively, the exclusion of 253(c) from 253(d) 
might reflect Congress's selection of a forum for 253(c) claims,
limiting jurisdiction to federal or state courts instead of forcing
municipalities with limited resources to defend rights-of-way
regulations and fee structures before the FCC in Washington, D.C. 
Cablevision argues for this reading, which has been adopted by a
number of courts on statutory interpretation and legislative
history grounds. See, e.g., TCG Detroit v. City of Dearborn, 977
F. Supp. 836, 840 (E.D. Mich. 1997) (finding that "the implication
[of 253(d)'s exclusion of 253(c)] is that any violation of
253(c) could not be preempted [by the FCC] but rather would have to
be[] challenged locally" and that legislative history supports this
interpretation). If this interpretation were correct, it would
become necessary to decide whether the proper cause of action for
a 253(c) claim is created by 253(c) itself or arises from some
other source.
 We prefer to reserve judgment on these questions, since
they are not, in the end, dispositive of this appeal and so may be
viewed as theoretical. Because the TCA is extremely complex and
its provisions highly interrelated, it is wiser to interpret it
only as needed in light of specific facts. Like the district
court, we will assume arguendo that 253(c) does impose a
"competitively neutral and nondiscriminatory" requirement and that
a cause of action exists to enforce that requirement. We turn now
to a subset of statutory interpretation questions regarding the
scope of this assumed requirement. 
 B. Scope of the "Competitively Neutral and
 Nondiscriminatory" Requirement
 According to Cablevision, the City's obligation to manage
its grant-of-location process in a competitively neutral and
nondiscriminatory manner can be read directly from the language of
 253(c). The district court disagreed, finding that "[t]he syntax
of [ 253(c)] renders its meaning ambiguous," and in particular,
that "[i]t is not clear whether the phrase 'competitively neutral
and nondiscriminatory' applies only to the compensation that can be
required, . . . or whether it also applies to the management of
public ways . . . ." Cablevision, 38 F. Supp. 2d at 58.
 As a matter of bare syntax, we find the language to be
unambiguous: the phrase "on a competitively neutral and
nondiscriminatory basis" can only apply to compensation schemes,
not management decisions. To see why this is so, it is necessary
to look closely at that phrase in context: 
 Nothing in this section affects the authority of a State
 or local government to manage the public rights-of-way or
 to require fair and reasonable compensation from
 telecommunications providers, on a competitively neutral
 and nondiscriminatory basis, for use of public
 rights-of-way on a nondiscriminatory basis, if the
 compensation required is publicly disclosed by such
 government.
47 U.S.C. 253(c) (emphasis added). The scope of the emphasized
language would be ambiguous if the text following the emphasized
phrase were omitted. In that case, the sentence would present what
linguists label a "prepositional phrase attachment" problem, i.e.,
an ambiguity arising from the fact that a prepositional phrase
within a sentence might "attach" to the sentence's syntactic
structure at more than one level. See Akmajian et al.,
Linguistics: An Introduction to Language and Communication 169-70
(1995) (giving a representation for such structural ambiguities). 
But no such attachment problem is presented here.
 In context, the emphasized language can only modify the
immediately preceding phrase, "to require fair and reasonable
compensation from telecommunications providers." There is a
technical linguistic basis for this reading: because -- for
semantic rather than syntactic reasons -- the following phrase "for
use of public rights-of-way on a nondiscriminatory basis" can only
attach to the phrase "to require fair and reasonable compensation
from telecommunications providers," it "traps" the phrase "on a
competitively neutral and nondiscriminatory basis" at this same
level. And contrary to Cablevision's argument, the commas
surrounding the phrase "on a competitively neutral and
nondiscriminatory basis" do not automatically alter the phrase's
syntactic scope; the commas merely enhance the readability of 
253(c) without changing its syntax. Even apart from technical
linguistic rules, there is a strong argument that the plain meaning
of the statute, despite the contrary interpretation by the FCC and
other courts, is that "on a competitively neutral and
nondiscriminatory basis" does not refer to management of rights of
way at all. 
 But the task of statutory interpretation involves more
than the application of syntactic and semantic rules to isolated
sentences. Even plain meaning can give way to another
interpretation if necessary to effectuate Congressional intent. 
See Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 825 (1st
Cir. 1992) ("Terms in an act whose meaning may appear plain outside
the scheme of the statute can take on a different meaning when read
in their proper context.... In short, the plain-meaning doctrine
is not a pedagogical absolute."); SEC v. Lehman Bros., Inc., 157
F.3d 2, 8 (1st Cir. 1998) ("literal language does not always
prevail"). Rather than "culling selected words [or sentences] from
a statute's text and inspecting them in an antiseptic laboratory
setting, a court engaged in the task of statutory interpretation
must examine the statute as a whole, giving due weight to design,
structure, and purpose as well as to aggregate language." 
O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir. 1996); see also
King v. St. Vincent's Hospital, 502 U.S. 215, 221 (1991) ("[T]he
cardinal rule [is] that a statute is to be read as a whole, since
the meaning of statutory language, plain or not, depends on
context." (citation omitted)).
 At times, an examination of the context of disputed
language can lead courts to decide that a linguistically
implausible interpretation best reflects the legislature's intent. 
Section 253(c) may require this sort of generous reading. See 
California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 284
(1987); Bob Jones Univ. v. United States, 461 U.S. 574, 586 (1983)
("It is a well-established canon of statutory construction that a
court should go beyond the literal language of a statute if
reliance on that language would defeat the plain purpose of the
statute...."); Watt v. Alaska, 451 U.S. 259, 266 (1981) ("The
circumstances of the enactment of particular legislation may
persuade a court that Congress did not intend words of common
meaning to have their literal effect."); United Steelworkers v.
Weber, 443 U.S. 193, 201 (1979) (rejecting literal reading of
statute in light of Congressional purposes in enacting statute). 
To the extent that Congress intended to impose any requirement that
local regulations be "competitively neutral and nondiscriminatory,"
the larger context suggests that it would have wanted to impose
that requirement on both management of rights of way and
compensation schemes, since discriminatory or competitively slanted
management of the public rights of way could interfere with open
competition among telecommunications providers just as easily as 
discriminatory or competitively slanted compensation schemes.
 At present, the weight of authority seems to favor this
contextual interpretation of 253(c) over a literal, syntactically
accurate one. The FCC did appear to limit the "competitively
neutral and nondiscriminatory" language to compensation schemes in
its Suggested Guidelines for Petitions for Ruling Under
Section 253, 63 Fed. Reg. 66,806 (1998). See id. at 66,808
(including the following in the list of questions for filers to
answer: "Does the challenged statute, regulation, ordinance, or
legal requirement pertain to the management of, or compensation for
access to, rights-of-way? . . . If compensation is involved, is it
fair and reasonable and required on a competitively neutral and
nondiscriminatory basis?"). But in its decisions, the FCC has
clearly adopted -- without any discussion -- the broader reading of
 253(c). See In re Classic Telephone, Inc., 11 F.C.C.R. 13,082,
 39 (Oct. 1, 1996); TCI Cablevision, 12 F.C.C.R. at 108. Courts
and commentators have also adopted the broader reading without
considering the possibility that the phrase "competitively neutral
and nondiscriminatory" does not refer to the management of rights
of way. See, e.g., TCG Detroit, 977 F. Supp. at 840-41 (assuming
the broader reading without discussion); Worstell, Note, Section
253 of the Telecommunications Act of 1996: A Permanent Physical
Appropriation of Private Property that Must Be Justly Compensated,
50 Fed. Comms. L. J. 441, 447-49 (1998) (decrying the effects of
the broader reading without mentioning the syntactically more
plausible narrow reading). But see AT&T Communications, 8 F. Supp.
2d at 587 (adopting narrow reading without discussion).
 Cablevision's reading of 253(c) is not frivolous. But
once again, we choose to set aside a difficult interpretative
question when the answer to that question is not dispositive of the
appeal. We will assume arguendo that the phrase "competitively
neutral and nondiscriminatory" in 253(c) refers to the City's
management of its rights of way and focus our analysis on the
interpretation of that phrase. 
 C. Managing Rights of Way "on a Competitively Neutral 
 and Nondiscriminatory Basis" 
 The critical issue for our purposes -- and the point on
which the parties actually disagree -- is whether the City has
violated any obligation under 253(c) to manage its public rights
of way so as to enhance the level of competition in the Boston
telecommunications market. 
 To understand the parties' differing positions on this
issue, it is helpful to first consider the many points on which the
parties seem to agree. 
 First, the parties have sensibly centered their arguments
on the term "competitively neutral," since Cablevision does not,
and could not, seriously dispute the district court's conclusion
that the City has managed its rights of way in a nondiscriminatory
manner. As long as the City makes distinctions based on valid
considerations, it cannot be said to have discriminated against
Cablevision in favor of Boston Edison. Here, as the district court
points out, those valid considerations are obvious: 
 Constructing new conduit requires digging up the City's
 streets and attendant disruption. Putting new cable in
 existing conduit or converting existing cable to new uses
 does not require digging up streets or disruption. Thus,
 it is not discrimination for the City to have different
 policies for the construction of conduit that is new and
 for the conversion of the uses to which existing conduit
 can be put.

Cablevision, 38 F. Supp. 2d at 60. 
 Second, the parties seem to agree that the City's new
oral policy regarding the conversion of cable or conduit complies
with 253(c)'s competitive neutrality requirement, because it
results in equivalent notice obligations for all market
participants. Assuming that the policy requires Boston Edison to
petition for amended grants of location before it converts cable or
conduit, competitors receive notice before new cable is pulled
through existing conduit (or alternatively, before cable is put to
a new use) as well as before new conduit is installed.
 Cablevision does make a halfhearted effort to argue that,
in order to achieve competitive neutrality, the City's policy on
conversions would have to impose requirements identical to those
imposed by the City's policy for the construction of new conduit,
including the requirement that shadow conduit be built alongside
any converted cable or conduit. But Cablevision does not insist on
this interpretation -- perhaps because it so obviously runs counter
to Congress's intent in 253(c) to "allow[] [local governments] to
preserve the physical integrity of streets and highways." TCI
Cablevision, 12 F.C.C.R. at 103. 
 Instead, Cablevision seems to view the competitive
neutrality requirement as limited by an implicit practicability
constraint. As Cablevision reads 253(c), it requires the City to
manage its rights of way in order to enhance competitive neutrality
-- but only to the extent that this goal is practicable for the
City. It is clearly not practicable to force those who are merely
converting conduit or cable to take the same steps as those
installing new conduit, and thus to incur all the same costs, since
this could result in significant disruption of Boston's streets. 
 Perhaps for this reason, Cablevision's interpretation of
the competitive neutrality requirement centers on the need to
ensure early notice of competitors' activities rather than a need
to equalize costs across competitors: in its view, 253(c)
requires the City to use its grants of location process to ensure
that telecommunications providers have the maximum information
available regarding their competitors' cable networks. Here again,
the parties seem to agree. Without explicitly conceding the point,
the City seems to assume that it is desirable for local
authorities, whether mandated by 253(c) or not, to seek to
enhance competition among providers by maximizing the sharing of
information among them. 
 Thus, while the parties are not in perfect agreement,
their only point of fundamental disagreement concerns the burden
any 253(c) competitive neutrality requirement would have imposed
during the time period between the enactment of the TCA and the
City's adoption of the conduit conversion policy, some two years
later. Cablevision argues that the competitive neutrality
requirement applied with full force from the moment of the TCA's
enactment. The City pleads instead for the application of some
sort of grace period that would allow it sufficient time to conform
its regulatory scheme to the statute's less than transparent
language. 
 Rather than settling this disagreement, we reject its
underlying premise. The disagreement is premised on the idea that
Congress intended the phrase "competitively neutral" to place an
affirmative obligation on local authorities -- an obligation to
enact regulations that create effective competition among
telecommunications providers. We find this interpretation
implausible, on a number of grounds. 
 Most obvious is the form of 253(c) itself. If Congress
meant to impose an affirmative obligation on local authorities to
promulgate regulations to ensure a level playing field among
telecommunications providers, it would not be likely to bury that
obligation in the middle of a savings clause to a preemption
provision. 
 The legislative history of the statute is also contrary
to this interpretation. Although Congress located the phrase
"competitively neutral and nondiscriminatory" within a savings
clause, there is a fair amount of support for the argument that
Congress intended this phrase to impose a negative restriction on
local authorities' power to regulate. See, e.g., 141 Cong. Rec.
H8460, H8461 (daily ed. Aug. 4, 1995) (discussing the need to
ensure that cities' franchise fee schemes treat competitors
equally). But there is no evidence to suggest that Congress
intended the phrase to impose on local governments an affirmative
obligation to enact regulations. If the phrase were meant to
impose such an obligation, this point would surely have been
mentioned prominently in the legislative history.
 Common sense also argues against "affirmative obligation"
reading of 253(c). If Congress directly obligated local
authorities to regulate toward certain ends (outside of the context
of conditional federal funding), local authorities would need to
keep a constant watch over Congress's activities, so that they
could respond in a timely manner with the necessary regulations. 
This continuing obligation could place a great burden on local
resources. The text and legislative history of 253 show no
desire on Congress's part to impose such a burden.
 Finally, we note that an affirmative obligation reading
of the term "competitively neutral" would raise significant
constitutional issues regarding Congress's ability to commandeer
local regulatory bodies for federal purposes. See Printz v. United
States, 521 U.S. 898, 934 (1997) ("The Federal Government may [not]
issue directives requiring the States to address particular
problems . . . ."); id. at 961 (Stevens, J., dissenting) (agreeing
that the notion of "cooperative federalism" does not include a
direct "mandate to state legislatures to enact new rules"); id. at
975 (Souter, J., dissenting) (agreeing with the majority that
"Congress may not require a state legislature to enact a regulatory
scheme"). This consideration again makes it unlikely that Congress
intended to include such an affirmative obligation in 253(c).
 We conclude that the term "competitively neutral" in
 253(c) imposes -- at most -- a negative restriction on local
authorities' choices regarding the management of their rights of
way. This means that the statute would not require local
authorities to purposefully seek out opportunities to level the
telecommunications playing field. If, however, a local authority
decides to regulate for its own reasons (e.g., to minimize
disruption to traffic patterns), 253(c) would require that it do
so in a way that avoids creating unnecessary competitive inequities
among telecommunications providers. 
 Cablevision is unlikely to be able to show that the City
violated this requirement. As long as the City was uninterested in
recording altered uses of existing conduit (apparently finding its
map of underground Boston adequate without this information), it
was under no obligation to record those uses for Cablevision's
benefit. Certainly nothing in 253(c) would have obligated the
City to collect and deliver to Cablevision the comprehensive
information demanded in Cablevision's proposed preliminary
injunction. The City would have been free, under 253(c), to
remain forever uninformed about Boston Edison's conversions. 
 Once the City concluded that it did want information
about altered uses of previously installed conduit and cable, it
began collecting that information in a manner that (to all
appearances, at least) is competitively neutral. It is easy to
imagine a conversion policy that would fail to be competitively
neutral -- for example, a policy under which only certain
applicants were required to file public petitions, while others
were allowed to keep their petitions private. But there is no such
allegation here.
 In the end, Cablevision's TCA claim fails for a simple
reason: it is directed at the wrong party. The City is not the
cause of any competitive problems faced by Cablevision, and it
cannot be commandeered via 253(c) to solve problems caused by
others. In sum, Cablevision's theory fails to state a claim on
which relief may be granted.
 V. STATE LAW CLAIM
 Cablevision alleges that the private defendants violated
state law by acting unfairly and deceptively in order to gain a
business advantage for the Joint Venture. See Mass. Gen. Laws ch.
93A, 2(a) (forbidding "[u]nfair methods of competition and unfair
or deceptive acts or practices in the conduct of any trade or
commerce"). The district court found that Cablevision was unlikely
to prevail on this claim. We agree.
 Massachusetts courts read the amorphous language of this
statute rather narrowly: in order to violate chapter 93A, "[t]he
objectionable conduct must attain a level of rascality that would
raise an eyebrow of someone inured to the rough and tumble of the
world of commerce." Quaker State Oil Refining Corp. v. Garrity Oil
Co., 884 F.2d 1510, 1513 (1st Cir. 1989) (quoting Levings v. Forbes
& Wallace, Inc., 396 N.E.2d 149, 153 (1979)); see also Johnson v.
Koplovsky Foods, Inc., 5 F. Supp. 2d 48, 55 (D. Mass. 1998). 
 The district court was not convinced that the defendants
acted with this level of rascality: 
 [A]t this point the evidence indicates that the Boston
 Edison defendants made no misrepresentations to the PIC.
 The Boston Edison defendants did not violate any
 agreement with the PIC. The Boston Edison defendants did
 not violate any policy adopted by the PIC concerning the
 conversion of existing conduit or cable to
 telecommunications uses. 
Cablevision, 38 F. Supp. 2d at 61. The court's evaluation of the
defendants' behavior was not clearly erroneous; to the contrary, it
is well supported by the record. 
 This conclusion does not end the analysis, though, since
one can commit a chapter 93A violation without behaving like a
"rascal," if one violates consumer protection or public safety
laws. See PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d
915, 917-18 (Mass. 1975); Piccuirro v. Gaitenby, 480 N.E.2d 30, 33-
34 (Mass. 1985); Mass. Regs. Code tit. 940, 3.16 (1978). 
Cablevision argues that Boston Edison violated two public safety
laws, Mass. Gen. Laws ch. 166, 21 and 22, and thus violated
chapter 93A as well. We find that Cablevision is not likely to
prevail on either point. Regardless of whether these laws qualify
as public safety or consumer protection laws, see Cablevision, 38
F. Supp. 2d at 62 (rejecting this contention), it does not appear
that Boston Edison's conversion of cable and conduit violated
either 21 or 22. 
 Section 21 provides, in relevant part:
 A company incorporated for the transmission of
 intelligence by electricity or by telephone, whether by
 electricity or otherwise . . . or for the transmission of
 electricity for lighting, heating or power, . . . may,
 under this chapter, construct lines for such transmission
 upon, along, under and across the public ways . . . . 

Mass. Gen. Laws. ch. 166, 21 (emphasis added). Cablevision
claims that the emphasized language means that "telecommunications
companies can place lines for telecommunications . . . and electric
companies can place lines for 'transmission of electricity,' but
not for any other purpose." This argument is creative, but not
convincing. If 21 is read as a whole, it becomes evident that
its purpose is not to control the uses to which different types of
companies may put their lines, but rather to specify where those
lines may be constructed. 
 The district court gave a detailed and able analysis of
 22, which need not be repeated here. See Cablevision, 38 F.
Supp. 2d at 61-62. We find that Cablevision is unlikely to prevail
on its 22 claim, because 22, which was enacted in 1849 and most
recently amended in 1925, simply does not speak to the issue of
conduit conversion. 
 VI. CONCLUSION 
 "Likelihood of success is the touchstone of the
preliminary injunction inquiry." Philip Morris, Inc., v.
Harshbarger, 159 F.3d 670, 673 (1st Cir. 1998). The order of the
district court denying the motion for a preliminary injunction is
affirmed. The district court should consider whether dismissal of
this action is warranted in light of this opinion. Costs to
appellees.

 - Concurrence Follows -

 NOONAN, Senior Circuit Judge, concurring in the result. 
On February 8, 1996 the Telecommunications Act of 1996 became law. 
See Pub. L. No. 104-104, 1996 U.S.C.C.A.N. (110 Stat. 56) 161. The
act was a major piece of legislation by the 104th Congress. It
occupies 105 pages in the United States Code Congressional and
Administrative News, Vol. I, Laws (1996). It is a comprehensive
and intricate piece of legislation. It reflects the input of
government regulators, the various industry groups affected, and
representatives of consumers and the general public. Inevitably it
is a compromise, a work of balancing values. Cf. Amherst, N.H. v.
Omnipoint Communications Enters., Inc., 173 F.3d 9, 13 (1st Cir.
1999). Where it is silent, it is likely to be designedly so. See
Stowell v. Ives, 976 F.2d 65, 70 n.5 (1st Cir. 1992).
 The Telecommunications Act in dealing with electronic
publishing by the Bell operating companies has a section entitled
"Private right of action," providing that any person claiming a
violation of the new law on that subject "may file a complaint with
the Commission [the Federal Communications Commission] or bring
suit as provided in section 207 of this title." 47 U.S.C. 
274(e). The cross-reference to 207 is to a provision of law
preceding the Telecommunications Act that is entitled "Recovery of
damages" and declares that any person claiming to be damaged by any
common carrier subject to this chapter "may either make complaint
to the Commission [the F.C.C.] as hereinafter provided for, or may
bring suit for the recovery of the damages . . . in any district
court of the United States of competent jurisdiction." Id. 207.
 Dealing with illegal changes in subscriber carrier
selections, the Telecommunications Act provides: "Any
telecommunications carrier that violates the verification
procedures described in subsection (a) of this section and that
collects charges for telephone exchange service or telephone toll
service from a subscriber shall be liable to the carrier previously
selected . . . in accordance with such procedures as the Commission
may prescribe. The remedies provided by this subsection are in
addition to any other remedies available by law." Id. 258(b).
 Referring to the review by state commissions of
agreements for interconnection between carriers, the
Telecommunications Act states: "In any case in which a State
commission makes a determination under this section, any party
aggrieved by such determination may bring an action in an
appropriate Federal district court to determine whether the
agreement or statement meets the requirements of section 251 of
this title and this section." Id. 252(e)(6).
 These provisions of law are sufficient to demonstrate
beyond doubt or cavil that when Congress intended in the
Telecommunications Act of 1996 to provide a remedy in the federal
courts for a violation of the Act it used language apt for that
purpose. Congress has not used such language in 253(c). In the
sharpest contrast, the language relied on by Cablevision in seeking
access to the federal courts by this suit reads as follows:
 Nothing in this section affects the
 authority of a State or local government to
 manage the public rights-of-way or to require
 fair and reasonable compensation from
 telecommunications providers, on a
 competitively neutral and nondiscriminatory
 basis, for use of public rights-of-way on a
 nondiscriminatory basis, if the compensation
 required is publicly disclosed by such
 government.
 
Id. 253(c). 
 It reads the statute backwards to infer from "Nothing
affects the authority . . . ," the authorization of a private suit
objecting to the exercise of that authority. A savings clause is
interpreted as a clause permitting the imposition of liability. A
safe harbor for state or local managers of public roads is turned
into a trap for them and a spring gun for telecommunications
providers. The language of 253(c) is so far from the language
Congress used when authorizing such suits that only violent
wrenching of the text can serve to squeeze such a sense out of it.
 Not only is this squeezing contrary to the plain meaning
of the statute, it runs counter to the statutory scheme of 253
itself. That section begins forthrightly, "No State or local
statute or regulation, or other State or local legal requirement,
may prohibit or have the effect of prohibiting the ability of any
entity to provide interstate or intrastate telecommunications
service." Id. 253(a). Subsection (b) then provides that a State
may impose certain conditions "on a competitively neutral basis and
consistent with section 254 of this section." Id. 253(b). The
FCC is given authority by subsection (d) to preempt the enforcement
of "any statute, regulation, or legal requirement that violates
subsection (a) or (b)." Id. 253(d).
 The statutory scheme is evident: The Commission is to
assure that state or local regulation does not frustrate the
competitive policies the Act is designed to promote. There is no
thought that a separate forum is furnished in the federal district
courts. To find such a forum here is to destroy the delicate
balance between the federal and the local that the Act has struck. 
See Amherst, 173 F.3d at 13.
 Cablevision seeks to tease out of the silence as to the
FCC's jurisdiction over subsection (c) an implied right of action
in the federal district courts. The silence is easily explained. 
If any state or local statute, regulation or requirement "has the
effect" of prohibiting an entity from providing telecommunications
service, subsection (a) is violated and the Commission under
subsection (d) has authority to act. There is no need to provide
a remedy under subsection (c). If Cablevision has a case for
discriminatory, anti-competitive action by the City, subsection (d)
has assigned the remedy to the FCC.
 Cablevision's only argument to the contrary is as
counter-intuitive as its reading of the statute. Cablevision
points to a version of the bill that was not passed as proof that
subsection (c) was meant to afford access to the federal courts!
 No circuit court has given heed to this argument. 
Abilene, Texas v. F.C.C., 164 F.3d 49 (D.C. Cir. 1999), is a review
of a decision of the Commission. It has nothing to say on the
enforcement of 253(c) except dicta that under both (b) and (c)
there is "a large regulatory territory for State authority." Id.
at 53.
 The intent of Congress not to provide a private cause of
action, explicitly or implicitly, in 253(c) is dispositive. See
Touche Ross & Co. v. Redington, 442 U.S. 560, 578 (1979). 
Cablevision has no basis for its suit under 253(c). There is no
occasion to take up the other issues thoughtfully explored by the
opinion of the court. There is no reason to retain the state
claim. There is no point in prolonging the possibility that 
253(c) provides a cause of action. There is no need to let the
case go on. The district court should be directed to enter
judgment for the defendants.